DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020-1089
Thomas Worger (5434840)
Thomas.worger@dentons.com
Laura Leigh Geist (pro hac forthcoming)
Laura.geist@dentons.com
Kelly Lloyd Lankford (admission forthcoming)
Kelly.lankford@dentons.com
(212) 768-6700
Attorneys for Plaintiff
Canopy Growth USA LLC

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CANOPY GROWTH USA, LLC, | No.: |
| Plaintiff, | **PLAINTIFF'S COMPLAINT AND JURY DEMAND** |
| -against- | |
| GO FARM HEMP, LLC; PAUL SMITH; AND JOSEPH SAGER | |
| Defendant. | |

## COMPLAINT

Plaintiff, Canopy Growth USA, LLC, ("Canopy Growth" or "Plaintiff") by a through its

Attorneys, states as follows:

## NATURE OF THE CASE

1.      This case arises from GFH's attempt to engage in an interstate fraud designed to

cheat Canopy Growth out of approximately $13 million and hundreds of acres of valuable hemp

seed.

2.      Canopy Growth is an industrial hemp company operating legally in the U.S. since the passage of the Agricultural Improvement Act of 2018.  Canopy Growth is a leader in industrial hemp cultivation in the U.S., currently cultivating approximately four-thousand acres of industrial hemp over seven states, and is scaling operations for large-scale industrial hemp processing, education, clinical research, and innovation.  As part of its cultivation strategy, Canopy Growth has partnered with U.S. farmers in several states with approved industrial hemp programs, including New York, California, Colorado, Oregon, Pennsylvania, North Carolina and Kentucky, to grow industrial hemp for Canopy Growth and support these farmers' entry into the hemp commodity market.

3.      Canopy Growth attempted one of these partnerships with Defendants GFH, and its founders Paul Smith, and Joe Sager.  Defendants claimed to Canopy Growth that they are in the business of growing, harvesting, and cultivating commercial grade hemp.

4.      Defendants represented they possessed the skill required to grow, harvest, and pack industrial hemp, on a large commercial scale and had the know-how and resources to farm over 1,000 acres of hemp in four states.  On several occasions, Smith boasted to Canopy Growth's Josh Rubin, Vice President of Hemp Cultivation, that he had a wide network of hemp growers and the ability to take on large scale projects.

5.      Defendants further represented they had obtained the rights to grow hemp on 1,115 acres of land (the "Farmlands") in New York, North Carolina, Colorado and Kentucky, and warranted that that the Farmland was suitable for growing the quantity and quality contracted for by the Parties.

6.      Based on these representations and others, Canopy Growth entered into two Custom Hemp Farming and Purchase Agreements with GFH, one for the farming of industrial hemp in New York (the "New York Agreement"); and one for the farming of industrial hemp in North Carolina, Colorado, and Kentucky (the "Three States Agreement") (collectively the "Agreements").

7.      Under the Agreements, Canopy Growth wired initial deposits to GFH.  These deposits were earmarked for expenditures necessary for ground preparation including mulch, irrigation, fertilizer, labor, equipment rentals, and water.  These amounts included an initial deposit of $1,192,500 under the New York Agreement and $2,934,000 under the Three States Agreement. The Purchase Price and deposit amounts were tied to Defendants' agreement to plant and cultivate 1,115 acres.

8.      Upon information and belief, Defendants did not spend the deposits for their intended purposes, but rather converted the funds to their own use.

9.      Defendants made additional false and misleading representations in reports to Canopy Growth regarding the progress of the crops.  These fraudulent misrepresentations induced Canopy Growth to wire  the next two monthly installment payments to Defendants.  In June and July of 2019, Canopy Growth wired  two payments of $1,113,000 under the New York Agreement, totaling $2,305,500, and two payments of $2,738,400 under the Three States Agreement, totaling $5,672,400.

10.     By the end of July 2019, GFH had induced Canopy Growth to wire $7,977,900 in installment payments to Defendants, in good faith and without knowledge Defendants has misled Canopy Growth in every respect.

11.     In contrast to their representations, Defendants did not possess the skill, knowledge or necessary experience to farm over 1,000 acres of hemp.  Defendants did not have the rights to over 1,000 acres of warranted Farmlands suitable for cultivating commercial grade hemp.  Rather, Defendants concealed from Canopy Growth the dismal output of the farms in each location, and falsely blamed acts of God including hail, grasshoppers and biblical rain.  Defendants neither had the ability nor the intent to ever fulfill the terms of the Agreements.

12.     Defendants induced Canopy Growth to pay deposits by bank wire with an intent to use the funds for their own personal purposes.  For example, on information and belief, Smith used the funds paid to GFH to buy a personal home in Panama, as opposed to obtaining the required labor and materials necessary to prepare and farm the acres and produce the warranted amounts of hemp biomass.

13.     The Agreements require Defendants to account for and invoice all expenditures for the sole purpose of growing and packaging hemp biomass for sale to Canopy Growth.  Defendants are not only required to maintain books and accounting; but make the records available to Canopy Growth for inspection.

14.     But when asked to account for their spending of the millions of dollars in deposits paid by Canopy Growth under the Agreements, Defendants went silent.  After a month of repeated

requests, Sager could produce only a email text ledger and no receipts.  What Defendants did with that money remains unknown, but they clearly did not utilize it in furtherance of the Agreements.

15.     In addition to the false and misleading statements and intentional omissions of material fact that Defendants made to induce Canopy Growth to enter the Agreements, from May to September 2019, Defendants engaged in serial breaches of contract and made additional false promises, representations, assurances, and warranties concerning the status of the acreage, Defendants' preparation for planting of the hemp crops and Defendants' use of the deposit and installment payments.

16.     These misrepresentations caused Canopy Growth to advance funds and take on risk it would not have had if known the true state of affairs.

17.     Defendants' preparations and farming practices were woefully inadequate and rendered the breaches incurable and the farms unsalvageable for the contracted purposes.

18.     In late July and early August, during Canopy Growth's field inspections of the Farmlands to understand the status of the fields, Canopy Growth recognized that Defendants were unable to perform and attempted to determine if there was any way possible to cure Defendants' deficiencies and harvest some viable Hemp Crop.

19.     What Canopy Growth found was shocking and beyond offensive to the Parties' Agreements.  Hundreds of acres were never planted, notwithstanding Defendants' representations that they had been planted.  On the acres GFH planted, the plant growth was stunted due to one or more of the following: improper field preparation and soil amendment, late planting, improper planting, a lack of weeding, poor fertilization, and a general lack of proper growing technique

appropriate to the growing of industrial hemp.  In some instances the weed choking caused locating

even a single hemp plant to be difficult.



20.     In the end, of the 1,115 acres Canopy Growth contracted and paid for, maybe 275

acres were viable.   At no point prior to the inspection, did Defendants communicate issues

regarding crop failure, land, or labor forces.  In fact, Smith continually assured Canopy Growth

that the crops were completely planted and very healthy.  Had GFH provided truthful updates to

Canopy Growth, Canopy Growth could have taken steps to reduce risk and expenditure, such as

ceasing the late planting.

21.     Canopy Growth provided notice of GFH's breaches and attempted to assist

Defendants in curing.  However, Defendants refused the assistance or the opportunity to cure.

Instead threatening Canopy Growth in all manner.

22.     Defendants never intended to fulfill the Agreements, and instead entered into the

Agreements with their own agenda- receive the deposits from Canopy Growth, misuse (steal) the

funds deposited, obscure the cause or reason for failed production, breach the Agreements and convert the plants Defendants did farm to intoseeds that Canopy Growth did not want and could not use so that Defendants could later sell those seeds and further profit from the sham agreements made to Canopy Growth.

23.     On information and belief, Smith bragged to his employees that he did not care if Canopy Growth crops failed because he already had enough money in the bank – enough to buy a home in Panama, and leave the country.

24.     The hemp specifications in the Agreements called for Defendants to employ vigilant efforts to physically remove all male seed before planting and to remove male plants in the field before fertilization could take place.  The Agreements called for the hemp to be "effectively free of seed" (less than 1% by weight). Hemp with seed would not meet the specifications in the Agreements and would be useless to Canopy Growth.

25.     In addition to the contractual terms, Defendants represented that they would utilize a "proprietary seed sorting method" prior to planting that would result in 85% or more female plants-- a percentage far higher than in typical, dioecious fields.  GFH promotes this "proprietary seed sorting" on its website, in a section titled "Kill the Males."  The only thing proprietary about the method is the secret Defendants kept to themselves, namely, that they would do *nothing* to sort the male seeds out or even cull them out later.

26.     On its website, GFH stresses the importance of inspecting the crops every day for signs of male plants.  Specifically, GFH states:

You WILL need to identify and Cull the males plants from the field prior to the pollen sacs opening up, otherwise you will have pollination.

If you are growing for biomass CBD flower, you do not want pollination.

27.     GFH advises that diligent inspection is key:

If you are farming hemp you should be inspecting your crop daily.

**It's what good non GMO hemp farmers do**, they pay attention to their plants, and they inspect them daily. (emphasis added)

28.     Defendants failed to practice what they preach as they did not engage in sorting, did not conduct diligent inspection, and did not remove the male plants from the few Canopy Growth hemp crops planted.

29.     When Canopy Growth conducted its inspections, it found the fields were littered with male plants and the plants were riddled with seed making the crop useless for Canopy Growth's purposes but conveniently good for Defendants' core business--seed production.

30.     By GFH's own admission, a good hemp farmer would have inspected the fields daily for signs of male plants and removed them.  GFH failed to remove the male plants- despite representing that they had and charging Canopy Growth for the services.

31.     GFH's failure was no accident.  Defendants' intention all along was to let the plants pollenate and then profit from the seed sales.  Defendants began selling the seed from Canopy Growth's plants-- even having the nerve to offer to sell the seed to Canopy Growth.

32.     In other words, Defendants used Canopy Growth to fund their own bank accounts and their seed-growing operations and then attempted to further profit by selling that seed back to Canopy Growth instead of the contracted biomass.

33.     In or around early August 2019, it was patently obvious that Defendants would not perform the Agreements as contracted.  In early August, Defendant Sager provided Canopy Growth with a "resolution proposal," which would have fundamentally altered the terms of the Agreements; and remarkably still required Canopy Growth to make further payments to Defendants.

34.     On August 15, 2019, Canopy rejected Defendants' offer.  Due to Defendants' lack of skill and knowledge, failure to timely procure proper land, failure to properly sort seed, failure to timely plant seed, failure to properly weed, and failure to properly remove rogue male plants from planted acreage, it was impossible for Defendants to meet the obligations under the Agreement.  Notice of Defendants' breaches of the Agreements was provided at that time as required by Article 12 of the Agreements.

35.     Defendants then turned the tables on Canopy Growth by accusing it of trespass and tortious interference, blocking  Canopy Growth from entering the fields with its own crews to remove the rouge males and salvage the crops.

36.     Defendants unilaterally terminated the Agreements, kept all of the monies paid and produced no Hemp Crop or biomass to Canopy Growth.  None.  After receiving over $7 million - not a single acre worth of hemp was provided to Canopy Growth.  Nor were any of the Purchase Agreement deposits or installments returned.

37.     Remarkably, and in stark contrast to its prior representations regarding its capabilities as a large-scale hemp farmer, GFH now admits it was not up to the task it agreed to undertake.

38.     In a late August letter entitled "GFH-CG Proposal to Move Forward," GFH states

"[i]t can be argued that CG [Canopy Growth] hired the wrong company . . . "  GFH goes on to

blame Canopy Growth for hiring GFH; all the while lamenting the "Herculean task" GFH agreed

to take on.  Specifically, GFH admits that:

(a)     GFH was a "two-man company," when it entered into the Agreements,
        completely lacking the personnel and manpower needed to perform the
        obligations it was undertaking in the Agreements;

(b)     GFH lacked adequate financing to fund its operations, stating "GFH's ability to
        launch and execute these projects was based solely on CG's ability to make the
        installment payments on hire;" and

(c)     GFH accepted the Kentucky property sight unseen, without even conducting
        sufficient diligence to learn it could not farm over half of the leased acres due to
        erosion control requirements.


39.     These admissions are a shocking contrast to GFH's prior warranties and

representations, including:

(a)     Mr. Smith's multiple claims regarding GFH's extensive growing network and
        GFH's own website claiming "[w]e know how to efficiently harvest this plant on
        LARGE acreage as well as small acreage.  We know how to effectively on large
        volumes, process dry and package this plant for sale;"

(b)     GFH's warranty in the Agreements that it had sufficient funding to finance its
        operations; and

(c)     GFH's warranty in the Three States Agreement that the Farmlands were adequate
        for the growth of hemp.

40.     As a result of Defendants' actions, Canopy Growth has suffered millions of dollars

in damages.

## PARTIES

41.     Canopy Growth is a Delaware limited liability company with its principal place of business and headquarters in Evergreen, Colorado.

42.     Canopy Growth cultivates, processes, and aims to create distinct consumer goods derived from industrial hemp for the U.S. commercial market.

43.     Defendant Go Farm Hemp LLC, upon information and belief, is a Nevada limited liability company, with its registered address at 701 N. Green Valley Parkway, Hendersen, Nevada 89074.  Upon information and belief, GFH has two members, Paul Smith and John Sager.

44.     Paul Smith is the "founder" of GFH and held himself out as the company's head grower.  He is believed to reside in the state of Nevada but conducts seed processing and sales in Colorado and on information and belief  he recently purchased a residence in Panama where he also resides.

45.     Smith represents that he "serve[s] the industrial hemp industry in Oregon primarily with matching buyers and sellers of raw hemp material and oil domestically and internationally. I have experience with facilitating and establishing long term business relations and contracts for production and shipment of CBD rich hemp per specification and needs of buyer complying with legal requirement of buyers state or county. I am able to source large bulk raw organic material and oil through an extensive network of farms and processors with all necessary licensing. I also consult hemp farmers on best practices, market trends, future planning, and marketing."

46.     Joe Sager held himself out as the Chief Financial Officer in GFH.  He is believed to be a resident of the state of New Jersey.

47.     Defendants hold themselves out as merchants experienced are in the business of growing, harvesting, and packing farm commodities, including hemp biomass, which refers to the dried plant matter that is used for the production of refined hemp products, such as CBD oil, textiles, hemp plastics, and others.   It is also believed that Defendants' primary commercial activities are selling hemp seeds for use by other growers.

48.     Canopy Growth is informed and believes and on that basis alleges as follows: (a) that Paul Smith and Joe Sager dominate and control the operations and activities of Go Farm Hemp, LLC concerning the matters alleged herein, for their own interest and benefit and in disregard of the separate corporate interest and benefit of Go Farm Hemp, LLC; (b) that there exists, and at all times mentioned herein existed, by reason of such domination and control of Go Farm Hemp, LLC by Smith and Sager a unity of interest between Go Farm Hemp, LLC and Smith and Sager with respect to the matters alleged herein, such that any individuality and separateness between them have ceased, and respecting the fictional separateness of the two would work a fundamental inequity and unfairness on Canopy Growth.   For these reasons, Smith and Sager should be deemed the alter ego of Go Farm Hemp, LLC, with respect to the matters alleged herein, and Go Farm Hemp, LLC's, conduct as alleged herein should be deemed in law and equity equally the conduct of Smith and Sager and both should be deemed equally liable for the conduct of one another as alleged herein below.

## JURISDICTION AND VENUE

49.     Jurisdiction is proper in this Court pursuant to Title 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

50.     As stated above, GFH is a Nevada resident.

51.     Paul Smith is an individual believed to be a Colorado resident spending a majority of his time in Denver (or alternatively, Nevada or Panama).

52.     Joe Sager is an individual believed to be a New Jersey resident.

53.     As stated above, Canopy Growth is a Delaware limited liability company with its principal place of business and headquarters in Colorado.  Canopy Growth has one member, EB Transaction Corp. (originally incorporated as EB Transaction Sub II, LLC), which is a Delaware corporation.

54.     The parties' Agreements contained a choice of law provision, pursuant to which the parties agreed submit to jurisdiction in the Western District of New York and the application of New York law.

55.     Venue is proper in this district pursuant to Title 28 U.S.C. § 1391(B) because Defendants contracted to perform services in this district and many of the breaches of the Agreements occurred in this district.

## ALLEGATIONS OF FACT

## BACKGROUND

**Hemp Industry in the U.S.**

56.     Section 7606 of the Agricultural Act of 2014 authorizes institutions of higher education or state departments of agriculture, if authorized under State law, to "grow[] or cultivate[ industrial hemp] for purposes of research conducted under an agricultural pilot program or other agricultural or academic research."  7 U.S.C. § 5940.

57.     The Agriculture Improvement Act of 2018, Pub.L. 115-334 (the "2018 Farm Bill"), removed hemp and extracts of hemp from the Controlled Substances Act schedules.

58.     Industrial hemp comes from the plant species Cannabis sativa.  It is a source of fiber and oilseed used in a variety of industrial and commercial products including textiles and cosmetics.

59.     Hemp differs from marijuana in that it is high in fiber and low in tetrahydrocannabinol ("THC"), the psychoactive ingredient in marijuana.  THC is found only in trace amounts in hemp.

60.     New York, Colorado, North Carolina, and Kentucky are four of the many states that currently authorize the commercial production of industrial hemp within the State provided an entity registers with its local county agricultural commissioner.

61.     On information and belief, Defendants are properly registered to grow industrial hemp in the states of New York, Colorado, North Carolina, and Kentucky.

**Canopy Growth Enters into Agreements with Defendants**

- 14 -

62.     Canopy Growth believes hemp has the potential for many commercial uses including industrial applications, cosmetics and beauty, health and wellness, and medical products. Canopy Growth has orchestrated planting thousands of acres of high-quality hemp seeds to meet the potential uses for hemp crops.  As part of its operations, Canopy Growth entered into contracts with U.S. farmers to grow hemp biomass at commercial scale.

63.     Canopy Growth hoped to enter its largest partnership for the 2019 growing year with Defendants, based on Defendants' representations regarding their abilities, skill, know-how and access to Farmlands.

64.     GFH touts itself as an expert in growing hemp.  Its website states: "We know how to farm this plant.  We know how to efficiently harvest this plant on LARGE acreage as well as small acreage.  We know how to efficiently on large volumes, process dry and package this plant for sale."  www.gofarmhemp.com.

65.     GFH represents "[b]reeding and Growing Heirloom, Stable, micro climate specific High Yielding Hemp Strains for farmers, from all micro climates, is what we do."

66.     GFH offers for sale strains of seeds and seedlings, including the "Relief Now" strain.  GFH advertises the "Relief Now" strain as:

> natural seed which have been hand selected and we guarantee that you will have 27,000 viable seeds per pound.  We hand select our hemp seed to provide you with the highest quality of heirloom seeds available anywhere.

67.     On May 14, 2019, Canopy Growth entered into an agreement, titled "Custom Hemp Farming and Purchase Agreement" with Go Farm Hemp LLC to purchase 300 acres of the Relief Now strain of hemp to be grown by GFH in the state of New York.  (the "New York Agreement")

68.     On May 16, 2019, Canopy Growth USA LLC, entered into a second agreement, also titled "Custom Hemp Farming and Purchase Agreement with Go Farm Hemp LLC" to purchase 815 acres of the Relief Now strain to be grown by GFH in the states of Colorado, North Carolina, and Kentucky.  (The "Three States Agreement" and collectively the "Agreements.")

69.     In the Agreements, GFH represented that it had two New York locations: (1) 2715 Tonawanda Creek Road, Amherst NY, 14288; and (2) 7189 Gowanda State Rd, Eden, NY 14057; as well as locations in Colorado, North Carolina and Kentucky: (1) 9787 County Rd 3, Kirk, CO 80824; (2) 5471 NC-150 Browns Summit, NC 27214; and (3) 36.871408,-88.985744 Carlisle County, KY.  (The "Farmlands.")

70.     On June 6, 2019, Paul Smith sent GPS images of the crop-circles in Colorado which included a crop circle identified as Circle 6, located at 39.572199, -102.892754, near the intersection of County Rds "O" and "14.

71.     Under the Agreements, Defendants warranted that:

(a)      GFH was "either the owner or lessee of the Farmlands, or otherwise has the right to use the Farmlands for the purposes hereunder;"

(b)     "the Farmlands' grade and soil conditions are suitable for growing Hemp Crop and otherwise complies with specifications contained in the Hemp Specifications;"

(c)     "there exists a suitable and adequate supply of water and rights thereto, considering both quantity and quality, for growing Hemp Crop;" and

(d)     GFH "has adequate financing to perform its obligations under this Agreement."

72.     Per the Agreements, Defendants were solely responsible for furnishing and paying for all operating costs, including, services, material, land, equipment, pre-sorted seed, herbicides, pesticides, other chemical products, labor, water, supplies, and other items related to the planting, cultivating, irrigating, weeding, thinning, hoeing, dusting, spraying, fertilizing, and otherwise growing hemp crop to completion, and to the harvesting of hemp crop in accordance with the specifications set out in the Agreements.

73.     GFH agreed to "use good farming practices for cultivation of hemp.  GROWER shall plant, grow, harvest, where applicable, and pack Hemp Crop in compliance with this Agreement and in accordance with the best standards and practices prevailing in the area and in accordance with the Hemp Specifications" set forth in the Agreements.

74.     GFH further agreed that it shall "have an affirmative obligation to exert its best efforts to produce a good standard of Hemp Crop, including the replacement, if reasonably possible and mutually agreed upon, by replanting, transplanting, or other appropriate action, of any Hemp Crop destroyed or damaged by any cause."

75.     The Agreements clearly stated that "time is of the essence," and that initial planting must commence on or about May 25, 2019 with completion of the harvest on or about November 30, 2019.  Timing was critical because the season for growing hemp is short.

76.     GFH contracted to grow a total of 1,115 acres of Farmlands: 300 in New York, 480 in Colorado, 135 in Kentucky, and 200 in North Carolina.

77.     At all times, Canopy Growth retained full legal and beneficial title to each block of hemp crop grown under the Agreements.

78.     The parties anticipated that GFH would deliver the minimum equivalent of 2,500 pounds of dried biomass per acre.

79.     If the minimum biomass production targets were not met, GFH was obligated to "fill the contract requirement with equivalent biomass or a lower price per acre will be negotiated by the BUYER."

80.     Canopy Growth agreed to purchase the entirety of the hemp biomass produced at an agreed upon price, set at an amount to cover Defendants' operating costs plus a premium payment for hemp biomass meeting testing and quality requirements as further specified in the Agreement.

81.     The Purchase Price under the Agreements was an estimate, based on the anticipated number of acres, 300 acres multiplied by $13,250 per acre in NY; and 815 acres total multiplied by $12,000 per acre in CO, NC and KY combined. The Agreements called for an adjustment in purchase price, should the "actual farmed acres" fall short of the agreed upon number.

82.     The Purchase Price was payable in installments, via wire transfer, with a deposit equal to 30% being due on the signing of the Agreements and the balance to be paid in five installments equal to one-fifth of the remaining balance.

83. The Agreements provided that, "[i]f there are strong indications that the crop will not meet the minimum production or quality standards, the last two payments may be withheld by the BUYER until proper yield accounting after harvest."

84. To aid Defendants' start-up costs, Canopy Growth wired initial deposits to GFH. As part of the New York Agreement, in May of 2019 Canopy Growth paid an initial deposit of $1,192,500 to Defendants' account for expenditures necessary for Defendants to obtain acreage, and for ground preparation including mulch, irrigation, fertilizer, labor, equipment rentals, and water.  Based on GFH's representations, Canopy Growth wired further advance payments to the Defendants, in June and July of 2019, in the total amount of a further $1,113,000, for a total advance payment of $2,305,500.

85. As part of the Three States Agreement, Canopy Growth wired an initial deposit of $2,934,000 to Defendants' account for expenditures necessary for Defendants to obtain acreage, and for ground preparation including mulch, irrigation, fertilizer, labor, equipment rentals, and water.  Based on Defendants' representations, Canopy Growth wired two further advance payments to the Defendants, in June and July of 2019, in the total amount of a further $2,738,400, for a total advance payment of $5,672,400.

86. The Agreements required GFH to maintain records of all expenditures, including receipts.

**Defendants Misrepresent the Acreage to be Farmed**

87. In April 2019, during the parties' negotiations and as part of the term sheet delivered by Defendants, Defendants represented that GFH had control of certain land in New

York State, where it had the opportunity to grow approximately 200 acres of cannabis plants and was capable of growing commercial hemp crops at the scale and quality required under the Agreements.

88.     Defendants made similar representations in the Agreements regarding a combined 815 acres in Colorado, Kentucky and North Carolina.

89.     As Canopy Growth later learned, these representations were false when made.  Not only did GFH not have rights to the number of acres represented, much of the acreage they did obtain was wholly unsuitable for growing hemp.

90.     The fraudulent representations regarding the acreage both induced Canopy Growth to enter into the Agreements and fraudulently inflated the Purchase Price, and consequently the initial deposits and installment payments wired by Canopy Growth.

**Defendants' Continuing Misrepresentations Regarding the Hemp Crop**

91.     Defendants' misrepresentations were not limited to the initiation of the Agreements.  Defendants misrepresented the status of the crops to induce Canopy Growth to make additional installment payments.

92.     On or about July 1, 2019, Smith sent a text message to Josh Rubin, Vice President of Hemp Cultivation with Canopy Growth, in which Smith painted a rosy picture of operations:

> In Colorado we have planted all 480 acres and the plants are up, we have a good stand.  In Ky we have planted 62 acres and they should have another 5 done tomorrow.  KY is seedling and direct seed. Total 129 acres.  In NC all 200 acres is in the ground, it's direct seed and it's up, it's a good stand.  NY is 30 acres planted at Ryan's in Eden another 70 to go.  I spoke with Don and we are planting

> tomorrow on 200 acres in Amherst.  It will be in the ground
> completely at Spoth Farms by the end of the week.

93. As Canopy Growth later learned, these representations were manifestly untrue. Kentucky was never going to be 129 acres due to erosion control limitations.  North Carolina was not fully planted and never amounted to 200 acres.  GFH had not even begun field preparations on the Meadow Green property.  The Amherst property was not finally planted until late July, weeks after this e-mail, and it was never 200 acres.

94. On July 11, 2019, Smith made further misrepresentations in a text message sent on behalf of GFH:

> Colorado, all 480 acres are planted.  Average height at 24 inches.
> Kentucky, 129 acres all planted.  30% planted with seedlings.
> Average height 16 inches. The remainder were direct seed.  Average
> height 6-8 inches.  New York, Amherst 190 acres planted.  Just
> coming up now.  Some has been in the ground just a few days.  New
> York, Eden planted with seedlings.  50% of seedlings are in the
> ground and we are finish up planting over the next two days.  North
> Carolina, All 200 acres planted.  70% direct seed.  30% seedlings.
> Average height 12-18 inches.  14,000 plants per acre.  Over the next
> ten days we are putting down more plants per acre in North Carolina
> to increase the plant population to 16,000 plants per acre, this will
> help stabilize the yield because we were so late going into the
> ground due to the weather.  We are putting an additional 225,000
> plants in the ground in North Carolina to increase the population per
> acre.

95. Again, these representations were false when made.  Smith provided such report to induce Canopy Growth to wire its third installment payment, and he knew his representations were falsehoods.  Kentucky could never be 129 acres due to erosion control issues.  Amherst, NY was not completely planted at this time and would never amount to more than 100 acres.  North Carolina was not fully planted.

96.     On or about July 24, 2019, after Rubin inspected the Colorado field operations for

a second time, Sager sent Rubin a text message stating:

> We have some challenges ahead of us, just know that Paul and I will
> do everything in our power to get the most out of these crops for you
> that we can and we'll get there with integrity.

97.     The issue identified was Defendants' failure to conduct any professional attempt to

control weeds causing massive weed chocking of the hemp plants.  That same afternoon Sager

confirmed to Rubin that GFH expected no further payments from Canopy Growth until issues were

resolved.  Rubin requested a full accounting after determining that failure to weed killed most of

the Colorado plants, a total loss.

**Canopy Growth Discovers Defendants' Falsehoods and Contractual Breaches**

98.     On August 2, 2019, following a report of a massive hailstorm "decimating" the

hemp crop in Colorado, representatives of Canopy Growth surveyed the state of affairs with

respect to those operations.

99.     What they found was shocking, not for the impact of the hail, but because of the

outright misrepresentations by Defendants that the site visit revealed.  The inspection confirmed

that although a hail storm had, in fact, impacted the area, Defendants' representations that such

storm had "decimated" the crop were overborne and shadowed by the true cause of the crop failure.

Canopy Growth discovered it was not the storm that had decimated the crops, it was Defendants'

neglect.

100.    In Field 1 Canopy Growth found some damage from hail, but overall there was not

very much hemp that could be identified. The hemp plants that were there were lengthy, rather

than bushy, due to the competition with the surrounding weeds. The hemp was affected by the hail,

but it appeared that the weeds choked out the majority of the crop prior to the hail storm.



101.    Field 2 had slightly more visible hemp than Field 1, but nonetheless, the majority

of the "stand," meaning growing hemp plants had been choked out by weeds.



102.     In the areas that had the weeds removed, it could be seen that the hemp plants had been affected, but not to the point of devastation.  Had the weeds been removed, this crop could have been taken to harvest with a decent yield.

103.     In Field 3, the hemp plants that had weeds removed around them were left almost completely defoliated. However, the majority of this field had yet to have a hoeing crew come through. In the areas that had weeds it was difficult to find hemp.  What Canopy Growth learned was that Defendants had moved their operations to weed from the farm areas designated for Canopy Growth to other nearby farm operations operated for Defendants' own use.



104.    In Field 4 a heavy presence of weeds showed that a crew had not come through this field either. Like the other fields, it was difficult to find any remnants of a hemp plant, mostly the weeds were ravaged.

105.    Field 5 did not have a single hemp plant standing, but it is unclear if there was any hemp present for the hail to damage.  The field was drilled in 100+ degree heat and there was never evidence that any of the seeds emerged as hemp plants before the hail storm ever arrived.  Meaning, it was Defendants' negligence and poor farming skills that killed the plants before the hail ever could.

106.    On August 2, 2019, Canopy Growth concluded that it was apparent from what was left standing that the pre-existing weed competition had severely affected the stand of hemp in the field. Out of all 635 acres, only approximately 5% had been cleared of weeds. The weed pressure drove the failure of the crops in this acreage.

107.    On August 6, 2019, representatives of Canopy Growth inspected field operations at GFH's operations in New York state.  What that investigation revealed was, *inter alia*, the following:

(a)       100 acres had been transplanted (not directly seeded), with 20 acres of transplants not taking place until July 22, 2019-- far later than the Agreements called for, and far later than Defendants represented they occurred;

(b)        In Amherst, it was clear there was no cultivation and GFH representatives confirmed there was no plan for cultivation.  There was significant weed presence in Field 1, which constituted approximately 90 acres.

(c)       The plants had barely emerged, in many instances only the first two leaves were visible, indicating the planting occurred far later than the Agreements called for or Defendants represented;

(d)        There was significant corn crop surface trash, which presented a risk of being thrown onto the hemp during cultivation.

(e)       There was no irrigation infrastructure and no plan to irrigate.

108.    On August 29, 2019, Canopy Growth undertook an investigation of the WD Henry

Farm in Eden, NY.  That investigation revealed, *inter alia*, the following:

(a)       Roughly 20% of the plants in the most heavily culled fields had pollen sacks.

(b)       In less culled fields approximately 50% of hemp plants contained pollen sacks.

(c)       In the first block with the most culled field male plants contained open pollen sacks and proved to be deeply rooted, indicating that they had manifested gender traits well before the August 29th visit.

(d)       Block One at Webster Road appeared to be transplanted at 7,000 plants per acre.

(e)       A total of roughly 30 acres scattered throughout additional blocks appeared to be transplanted at less than 2,000 plants per acre, including male and hermaphrodite plants.  GFH unilaterally and purposefully reduced the number of plants per acre from the agreed upon 7,000 to 2,000 to claim more acres were planted.  However, the reduction in density

meant these were not the full capacity acres Canopy Growth contracted for.

(f)        Block Two at Eckhardt Road had plantings of both densities and no culling work had been performed.

109.    The presence of the pollen sacks showed that, contrary to the Agreements, GFH had not separated the males, either during the seed sorting, or when they began to manifest gender traits in the field.

110.    During the inspection, Canopy Growth learned that there was no plan for cultivation, no irrigation system or plan for irrigation, and no plan for bailing the hemp crop. GFH was responsible for all of these tasks, and had Canopy Growth's deposits and installment payments to fund them, yet it was clear Defendants did nothing.   When all was said and done, Canopy Growth had contracted for, and paid for, 1,115 acres, of which maybe 275 was actually viable.

**Canopy Growth's Demand for an Accounting is Met with More Breaches and Falsehoods**

111.    After the disastrous survey in Colorado, Joshua Rubin made multiple requests to GFH for an accounting of Canopy Growth's funds.

112.    On August 3, 2019, Canopy Growth formally exercised its contractual right to request a full accounting from Defendants.

113.    The next day, Sager sent an e-mail proposing a radical change to the Agreements. In the email, Sager stated that "GFH has given 100% effort to give our partner, Canopy Growth, success, and we will continue to do so."  However, that was demonstrably untrue.

114.    Sager proposed changing the funding going forward to reflect the viable acreage, but refused to refund the prior funds for which they overcharged Canopy Growth.

115.    Sager admitted Defendants never inspected the land in Kentucky it obtained for Canopy Growth, despite contractually having warrantied regarding its suitability.

116.    Sager also admitted that GFH was planting acres in Colorado for its own purposes, and that it did not know which acres were GFH's and which acres were for Canopy Growth. GFH's farming project actually posed a risk to Canopy Growth because GFH devoted time and resources to its own acres when it should have been cultivating the early season weeds on Canopy Growth's acres.

117.    Sager proposed dividing the Colorado acreage, giving Canopy Growth 74.28 of the 130 "good" acres.

118.    Canopy Growth did not accept this proposal.

119.    On August 14, 2019, Sager responded to Canopy Growth's demand for an accounting, stating, *inter alia* that,

> The first and largest cost was the sorting, selecting and purchase of the GFH natural seed. For farm projects, GFH charges $2,000 per acre of selected seed. We charged for 1,040 acres after not seeding 75 acres in KY. This is $2,080,000.  Reseeding - GFH, in order to make up for late planting, GFH reseeded 500 acres (300 acres in NY and 200 acres in NC). At $2,000 per acre, this cost was $1,000,000. 745,000 seedlings at $1 per seedling (discounted from our regular $1.15 per seedling) = $745,000.

120.    These figures were premised on falsehoods and represented a *post hoc* attempted to explain away Defendants' spending.

121.    Defendants never seeded 1,040 acres-- any reseeding that occurred was the result of GFH's negligence.  Moreover, the seed was not "natural seed" or "pre-sorted seed."  Canopy

Growth discovered the seed GFH used was dirty, full of rocks, and contrary to all representations both pre-contractual and contractual.

122.   Canopy Growth believes it was charged for sorting that never occurred and that Defendants intentionally allowed the plants to go to seed for Defendants' own purposes knowing the plants would be unusable biomass for Canopy Growth.

123.   On or about August 23, 2019, Smith and Sager presented Canopy Growth with a letter entitled "GFH-CG Proposal to Move Forward."  In that document, GFH made shocking admissions that it knew when it entered the Agreements that it was unprepared and inadequate to perform its contractual obligations.  Even more shockingly, GFH attempted to blame of Canopy Growth for deciding to hire GFH and trusting GFH's representations regarding its ability to perform.

124.   Specifically, GFH admitted that:

   (a)   GFH was a "two-man company," when it entered the Agreements and completely lacked the personnel and manpower needed to perform its obligations thereunder;

   (b)   GFH lacked adequate financing to fund its operations, stating "GFH's ability to launch and execute these projects was based solely on CG's ability to make the installment payments on hire;" and

   (c)   GFH accepted the Kentucky property sight unseen, without even conducting sufficient diligence to learn it could not farm over half of the leased acres due to erosion control requirements.

125.   These admissions are a shocking contrast to GFH's prior warranties and representations, including:

(a)     Mr. Smith's multiple claims and GFH's own website;

(b)     GFH's warranty in the Agreements that it had sufficient funding; and

(c)     GFH's warranty in the Three States Agreement that the Farmlands were suitable for hemp garming.

126.     Further, GFH's contention that its failures were caused by late payments by Canopy Growth is demonstrably false.  At this point, Canopy Growth had timely wired $7,977,900 to GFH-- the amount owed under the Agreements.  That amount was based on a price per acre of $12,000 for the 815 acres in CO, NC and KY combined; and a price per acre of $13,250 for 300 acres in NY.  However, as Canopy Growth later learned, GFH did not disclose that it was not farming anything close to 1,115 acres-- meaning Canopy Growth significantly <u>overpaid</u>, leaving GFH with more than sufficient funding.

127.     Further, GFH's failures date back to the inception of the projects.  GFH failed to prepare the land, failed to plan for irrigation, and failed to timely and properly plant.  Those failures were not due to any supposed delay in payment because GFH had over $7 million of Canopy Growth's money at that point.  What GFH did with that money is a mystery.

128.     Having now blamed Canopy Growth for hiring GFH, and a supposed lack of funding, Defendants next blamed God for plagues including hail, grasshoppers, and rain.

**GFH Refuses Canopy Growth's Offers of Assistance and Opportunity to Cure**

129.     On September 1, 2019, Canopy Growth's Joshua Rubin wrote to Sager, proposing a remediation plan for the remaining viable acres in Eastern Colorado.  Rubin confirmed that Canopy Growth had arranged for professional agriculture crews to begin rogueing males in Circle 6, a specific area of the Colorado Farmlands, on Tuesday, September 3, 2019, and would then

continue to Circle 8 in order of priority. Additionally, heavily weeded areas in Circle 6 that had not had weeds removed to date would be mowed completely in order to prevent pollen drift into cleared areas. Rogueing and mowing would be done simultaneously and immediately.

130.   Later that same day, Sager rejected Canopy Growth's proposal, advancing the position that Circle 6, which had previously been confirmed as a parcel of land under growth for Canopy Growth, was not, in fact, under growth for Canopy Growth.   The assertion that Circle 6 was not contracted to Canopy Growth was false.

131.   On September 3, 2019 Defendant denied Canopy Growth's crew access to enter the property identified as Circle 6 in Colorado.

132.   On September 5, 2019, Defendants sent formal legal notice, through counsel, pursuant to which Defendants accused Canopy Growth of materially breaching the Agreements by attempting to inspect Circle 6 and attempting to tortuously interfere with GFH's contractual relations with the owners of Circle 6.

133.   Pursuant to that same letter, Defendants represented that they were unilaterally terminating the Agreements, effective immediately.

134.   Defendants then provided Canopy Growth notice that they had ceased manufacture and had prepared to resell the Hemp Crop for scrap or salvage value or would proceed in "any other reasonable manner determined by GFH based on currently prevailing standards for industrial hemp cultivation, manufacture, processing and distribution in the United States."   It was always Defendants' intent to let the crop seed and use it for Defendants' own purposes, even offering at one time to share in the seed sales with Canopy Growth.

## COUNT I
### (Breach of Contract)

135.     Canopy Growth realleges and incorporates the foregoing allegations as though fully set forth herein.

136.     Canopy Growth entered into the Agreements with Defendants, which obligated Defendants to, *inter alia*, obtain and prepare the agreed upon quantity and quality of land on which to grow hemp; to plant, grow, harvest and pack the hemp crop in accordance with good farming practices and the Hemp Specifications contained in the Agreements; to use its best efforts to produce a good standard of Hemp Crop; and to maintain books of account and financial and accounting records and to make those records available to Canopy Growth.

137.     Defendants breached the Agreements by, *inter alia*, failing to procure the agreed upon quality and quantity of acreage; failing to sort the seeds and plants, as agreed; failing to adhere to the planting schedules; failing to tend to and cultivate the plants in accordance with good farming practices; failing to plant the full acreage called for in the Agreements; misusing deposit funds and installment payments; failing to adequately substantiate expenditures as required by the Agreement, and failing to otherwise perform services, timely, adequately, satisfactorily, and in accordance with the Agreement.

138.     In a show of good faith, and an attempt to mitigate its losses, Canopy Growth gave Defendants every opportunity to cure, and even offered to assist Defendants in curing their multiple breaches.

139.    Despite repeated requests and attempts by Canopy Growth to assist Defendants in curing their breaches, Defendants failed to comply with their obligations under the Agreements.

140.    Canopy Growth performed its obligations and met all of its conditions under the Agreements, and/or is excused from having to do those things because of Defendants' conduct.

141.    As a direct and proximate result of the material breaches by Defendants, Canopy Growth has suffered and incurred substantial damages in specific amounts to be proven at trial including, but not limited to, funds Canopy Growth paid to Defendants under the Agreements and all other damages, caused by Defendants' breaches.

## COUNT II
### (Breach of the Implied Warranty of Merchantability)

142.    Canopy Growth realleges and incorporates the foregoing allegations as though fully set forth herein.

143.    GFH deal in hemp plants and seeds and holds itself out as having knowledge and skills particular to the hemp industry.

144.    Specifically, GFH represents on its website that  "We know how to farm this plant. We know how to efficiently harvest this plant on LARGE acreage as well as small acreage.  We know how to efficiently on large volumes, process dry and package this plant for sale."

145.    Further, GFH, as set forth in its September 5, 2019 termination letter, considers itself to be a "merchant" under the Uniform Commercial Code.

146.    GFH entered into the Agreements with Canopy Growth for the sale of hemp, specifically acres of the Relief Now strain.

147.    Implied in that Agreement is a warranty of merchantability, meaning, *inter alia*, the goods must pass without objection in the trade under the contract description.

148.    GFH described the Relief Now strain as "natural," "hand-selected," and heirloom quality.

149.    However, the seed did not meet this description.  It was dirty and full of rocks, not natural or hand-selected.

150.    The contract described the biomass to be grown as "effectively free of seed (less than 1% by weight).

151.    However the biomass grown did not meet this description.  The biomass, at present, is riddled with seed.

152.    The seeds and the biomass would not pass without objection in the hemp industry under the contract descriptions, nor are they fit for the ordinary purpose of growing industrial hemp for commercial purposes.

153.    As a direct and proximate result of the material breaches by Defendants, Canopy Growth has suffered and incurred substantial damages in specific amounts to be proven at trial including, but not limited to, funds Canopy Growth paid to Defendants under the Agreements and all other damages, caused by Defendants' breaches.

## COUNT III
### (Fraud in the Inducement- the New York Agreement)

154.    Canopy Growth realleges and incorporates the foregoing allegations as though fully set forth herein.

155. Defendants made multiple misrepresentations during the negotiation of the New York Agreement. Defendants knew that these representations were false when made, but they made them intending to induce Canopy Growth to enter into the New York Agreement.

156. First, Defendants represented that they had the skill required to grow, harvest and pack agricultural commodities on a large commercial scale.

157. Second, Defendants made specific misrepresentations of present fact when presenting the term sheet to Canopy Growth prior to entrance into the New York Agreement. Specifically, in April 2019, as part of the term sheet, Defendants represented that GFH owned or had obtained leases for approximately 300 acres of property in New York. Defendants warranted that GFH was either the owner or lessee of these lands, the lands were suitable for growing hemp, and otherwise complied with the specifications in the New York Agreement, GFH had suitable and adequate water and water rights, both in quantity and quality, to grow the hemp, and GFH had adequate funding to finance its operations under the New York Agreement.

158. These representations were false when made. Defendants did not own or lease the land they described. As it turns out, not only did Defendants not have the land at the time, they made the representation, the land they later obtained was far less than represented and was unsuitable for growing hemp. Further, in a letter sent on or about August 23, 2019 Defendants admitted that GFH did not have adequate employees or experience to farm and harvest hemp crop on this scale. In that same letter, Defendants also admitted that GFH lacked the funding to finance its operations.

159.    Defendants also represented they would remove male seed and plants from the hemp fields, that they had a proprietary process that would improve the typically 50-50 male/female ratio to nearly 85 % female plants.  This was false.  At no time did Defendants utilize any pre-sorting effort to reduce male seeds nor did Defendants ever eradicate the male plants. Instead intentionally allowing the males to pollenate and the crop to seed.

160.    Moreover, Defendants were aware that these representations were false when made, but they made them intending to induce Canopy Growth to enter into the New York Agreement.

161.    Canopy Growth relied on Defendants' representations when deciding to enter into the New York Agreement.  Had Canopy Growth known that GFH did not have the experience or capabilities represented, or that it had not procured suitable and adequate land and water rights or financing, Canopy Growth would not have entered into the New York Agreement, and certainly would not have paid the initial deposit.

162.    Defendants' misrepresentations induced Canopy Growth to enter into the Agreements and to wire the initial deposit of $1,192,500 to Defendants to fund the start of its operations, which it would not have done had it known the truth.

## COUNT IV
### (Fraud in the Inducement- the Three States Agreement)

163.    Canopy Growth realleges and incorporates the foregoing allegations as though fully set forth herein.

164.    Defendants made multiple misrepresentations during the negotiation of the Three States Agreement.  Defendants knew that these representations were false when made, but they made them intending to induce Canopy Growth to enter into the Three States Agreement.

165.    First, Defendants represented that they had the skill required to grow, harvest and pack agricultural commodities.

166.    In addition, Defendants made specific misrepresentations of present fact when presenting the term sheet to Canopy Growth prior to entrance into the Three States Agreement. Specifically, Defendants represented that GFH owned or had obtained leases for 815 acres of property suitable for growing industrial hemp in Colorado, North Carolina and Kentucky.

167.    These representations were false when made.  Defendants did not own or lease the land they described.  As it turns out, not only did Defendants not have the land at the time, they made the representation, the land they later obtained was not as warranted and unsuitable for growing hemp.  Further, in a letter sent on or about August 23, 2019, Defendants admitted that GFH lacked the experience or manpower to grow and harvest a hemp crop on this scale.  In that same letter, Defendants admitted that GFH did not have adequate funding to finance its operations.

168.    Moreover, Defendants were aware that these representations were false when made, but they made them intending to induce Canopy Growth to enter into the Three States Agreement.

169.    Canopy Growth relied on Defendants' representations when deciding to enter into the Three States Agreement.  Had Canopy Growth known that GFH did not have the experience or capabilities represented, or that it had not procured suitable and adequate land and water rights

or financing, Canopy Growth would not have entered into the Three States Agreement, and certainly would not have paid the initial deposit.

170.     Defendants' misrepresentations induced Canopy Growth to enter into the Three States Agreement and to wire the initial deposit of $2,934,000 to Defendants to fund the start of its operations, which it would not have done had it known the truth.

## <u>COUNT V</u>
## <u>(Fraud)</u>

171.     Canopy Growth realleges and incorporates the foregoing allegations as though fully set forth herein.

172.     In addition to fraudulently inducing Canopy Growth to enter into the Agreements, GFH engaged in a serious of fraudulent misrepresentations to induce Canopy Growth to transfer additional installment payments under the Agreements.

173.     On July 1, 2019 text message from Smith to Rubin, in which Smith made a number of misrepresentations regarding the status of the current planting and its next steps.  In that text message, Smith falsely represented the following:

    (d)        New York: GFH would plant 200 acres in Amherst on July 2, 2019.  This was false- Amherst would never be 200 acres and was not fully planted until late July.

    (e)        Kentucky: GFH had already planted 62 acres, with another 5 in progress, and would total 129 acres.  This was false- GFH knew it could not plant 129 acres in Kentucky due to erosion control limitations;

    (f)        North Carolina: GFH finished planting all 200 acres.  This was false. GFH had not complete planting, and the North Carolina location was never 200 acres.

174.    On July 11, 2019, Smith sent another text message in which he represented the following:

(a)    New York:  GFH planted 190 acres in Amherst, 50% of the seedlings in Eden and 50% to be planted in the next two days.  This was false.  New York was not completely planted and would never amount to more than 100 acres in total;

(b)    Kentucky: GFH planted all 129 acres, 30% seedlings with 16 inches average height and 70% direct seed with average height of 6-8 inches. This was false.  Kentucky never amounted to 129 acres due to erosion controls;

(c)    North Carolina: GFH planted 200 acres planted with 14,000 plants per acre and would add additional plants per acre to increase the population per acre.  This was false.  North Carolina was not fully planted; and

(d)    Colorado: GFH had planted all 480 acres and the average plant height was 24 inches  .

175.    Defendants knew these reports were false, but provided them to induce Canopy Growth to wire additional installment payments.

176.    In reliance on these and other representations from Defendants, Canopy Growth made two further payments under the New York Agreement, for a total of $2,305,500 and under the Three States Agreement for a total of $5,672,400.

177.    In addition, to hide its misappropriation of Canopy Growth's deposit money, Defendants fraudulently attempted to charge Canopy Growth for services that never occurred.  On August 3, 2019, Canopy Growth demanded an accounting for the funds advanced to GFH to date. In response to that request, Defendants engaged in more misrepresentations.  Sager represented the cost to sort, select and purchase natural seed was $2,080,000 ($2,000/acre for 1,040 acres).

This representation was false.  GFH never seeded 1,040 acres.  In addition, the seed was never sorted, nor was it "natural seed."  The seed was dirty and full of rocks-- clearly it had not been sorted as Sager represented.  Sager manufactured these charges to cover for its misappropriation of the funds.

## COUNT VI
### (Conversion)

178.    Canopy realleges and incorporates the foregoing allegations as though fully set forth herein.

179.    Canopy Growth advanced approximately $11,827,300 to Defendants.  This money was not a free bank account for Defendants to use as they pleased.  Rather, Defendants were to use the funds to obtain acreage, prepare the ground for planting, and rent equipment to perform their services for Canopy Growth under the Agreements.  Defendants were obligated, and agreed, to maintain records, including receipts, that accounted for all expenditures.

180.    Instead, Defendants kept Campy Growth's money and used it for their own purposes.

181.    When Canopy Growth demanded an accounting, Defendants were unable to account for the funds.  Defendants attempted to create a cover story regarding charges for sorting seed and reseeding.  However, Defendants did not conduct sorting or reseeding, and therefore those charges were false.

182.    Defendants refuse to return the funds to Canopy Growth.

183.     As a result of Defendants' actions, Canopy Growth has been denied the use of its funds and has been harmed as a result.

## COUNT VII
### (Deceptive Practices in Violation of N.Y. G.B.L. §§ 349 & 350)

184.     Canopy realleges and incorporates the foregoing allegations as though fully set forth herein.

185.     GFH represents to the public, through its website and other means, that it is as an expert in growing hemp.   GFH describes its business as "[b]reeding and Growing Heirloom, Stable, micro climate specific High Yielding Hemp Strains for farmers, from all micro climates, is what we do."

186.     GFH also represents that its product, specifically the Relief Now strain of hemp is "natural seed which have been hand selected and we guarantee that you will have 27,000 viable seeds per pound.  We hand select our hemp seed to provide you with the highest quality of heirloom seeds available anywhere."

187.     However, the Relief Now strain GFH sells is dirty, full of rocks, and unsorted.  It is not "heirloom," "hand selected" or pre-sorted, as represented.

188.     The representations contained on GFH's website, and upon information and belief, in other marketing materials, are materially deceptive.

189.     GFH aims these deceptive representations towards consumers, like Canopy Growth.

190.    Canopy Growth purchased the Relief Now strain of seeds as a result of these representations, and it has suffered injury as a result.

## COUNT VIII
## (Constructive Trust)

191.    Canopy Growth realleges and incorporates the foregoing allegations as though fully set forth herein

192.    As a result of Defendants' wrongdoing, unlawful acts, breach of contract, breach of good faith and fair dealing, conversion, fraud, and unjust enrichment as alleged above, Defendant are in possession of money that belongs to Canopy Growth, and will receive future monies that rightfully belong to Canopy Growth.

193.    The court should impose a constructive trust to prevent unjust enrichment to Defendants, and should require that any revenues and profits derived from the above-mentioned wrongful acts be placed in a constructive trust in favor of Canopy Growth.

## PRAYER FOR RELIEF

WHEREFORE, Canopy Growth prays that the Court enter judgment in favor of Canopy and against Defendants which:

(a)      Awards judgment in favor of Canopy Growth and against Defendants on all Counts of the Complaint;

(b)      Awards Canopy Growth all damages caused by Defendants' breaches of the Agreements;

(c)      Awards Canopy Growth punitive damages;

- 42 -

(d)         Awards Canopy Growth pre and post judgment interest;

(e)         Awards Canopy Growth all cost and reasonable fees and expenses incurred in defending and prosecuting this action;

(f)         Awards Canopy Growth statutory penalties under N.Y. G.B.L. §§ 349 & 350;

(g)         Awards Canopy Growth a constructive trust; and

(h)         Awards Canopy Growth such other and further relief as is just and proper.


Dated: New York, New York
       October 8, 2019


By:   /s/ *Thomas Worger*
      Thomas Worger
      Thomas.worger@dentons.com
      *Attorneys for Plaintiff Canopy Growth USA, LLC*